The next case we'll hear is Beyond Systems v. Kraft Foods and Mr. Willard. May it please the Court. My client, BSI, is a small Internet service provider based in Maryland that has received most but not all of its revenue in recent years from pursuing anti-spam litigation. BSI's litigation activities advance the goals of the California and Maryland statutes under which it is suing because it punishes and deters people who send false or deceptive spam emails to be subjected to lawsuits. Are you suggesting the company is sort of an attorney general functioning on behalf of people who otherwise either wouldn't or don't seek spam damages? Yes, Your Honor. We suggest that our client is like a private attorney general, which these statutes create an incentive to pursue. And the district court suggested that in doing that, you have to put yourself in harm's way and create the damages. In other words, instead of being a victim, you are seeking out the spam, or else be able to punish the spammers. Yes, Your Honor, that was the district court's alternative theory. The only theory the district court submitted to the jury, where there was a jury verdict, was on the issue about whether a plaintiff … Well, that may be totally irrelevant. I mean, basically, the court did find that you're not a bona fide service provider. Yes, Your Honor. The jury did, but … But then the court went ahead and granted summary judgment on a backup theory that our client consented to the spam. It's also a settlement theory. I mean, there's a bunch of issues here, but I think at bottom, the court was troubled by the notion that you were essentially sort of milking a statute. You're injecting yourself with damage in order to collect a lot of money. So I concluded it was $146 million you want. Well, Your Honor, the district court said that there were 600,000 spam emails at issue. No, which you're asking for. You said there were 73,000 spams in California and 73,000 in Maryland, and $1,000 per spam. That's $146 million. Well, Your Honor, a number of those have been eliminated by the judge's ruling on statute of limitations, which we don't contest. Well, he eliminated them all, didn't he? Well, yes, Your Honor, he did that too, but we're appealing from that. I understand. The judge … Before you go there, I want to make sure Judge Nima touched on that alternate theory that you say the judge relied upon here. It seems to arise in the vein of the Omega case that says that these cases that survive preemption arise in the vein of tort. Do you agree with that? We don't. I wouldn't necessarily agree with it, but we don't challenge it on this appeal. I mean, isn't that the Omega case? It's kind of hard not to agree with it, isn't it? Well, Your Honor, the Omega case dealt with what kind of spam e-mails can be actionable under the federal preemption language in the Cannes Spam Act. And in that case, it found that the e-mails were not false or deceptive and therefore couldn't be made actionable by the states under the federal preemption law. Those that survive preemption have to be in the vein of tort, did it not? I don't disagree, Your Honor. So that's where we get to this alternative theory. Yes, Your Honor. And if we can accept that common law, that is the issue here, has been adopted by both of these states, why is that not a – it may be alternative, but it seems to be pretty strong to say that you cannot go out and put yourself in harm's way for the purpose of getting recovery. And then continually, because you admitted from the beginning, you said, you know, our purpose here is we don't – we're not really – you didn't say it in those words, but you essentially said 90, 90 some odd percent of what we do is this, we're in litigation, not really providing Internet services. So the jury found that too, but that's a whole different issue than what I'm dealing with here. So in that regard, speak to that common law doctrine that's active in both states. I mean, as to whether you can do that in tort. Yes, Your Honor, if I may, I'd like to. Our position is that while common law doctrines can be applied in certain statutory causes of action, that doesn't happen if it undermines the achievement of the statutory purpose. The question of consent, or as the judge called it, valenti non finituria, was addressed by the California legislature in the statute. It said that people who receive unconsented commercial emails that are false or deceptive can sue for statutory damages, and it defined consent. It said consent was only expressed consent, not the kind of implied consent found by the district court in this case in its ruling on summary judgment. The Maryland statute goes even further. I don't follow that. This is not implied consent. You voluntarily went out and transmitted those spams from California to Maryland in order to get double damages. Your Honor, that's not true. That's a red herring in this case. All the spams in this case were sent by the defendants from California. Therefore, whether they had been transmitted by way of the HyperTouch servers in California or directly to Maryland… HyperTouch is his brother, and so he gets them on his computer and then he sends them to his brother in Maryland, and then they claim $1,000 for each one in each state. Your Honor, the damages in this case arise under California law because the defendants sent them from California, which is a violation of California law. To California. From California to California where they were captured by your client and sent on to Maryland so that you could sue. Your Honor, we did not sue. Our complaint does not allege a cause of action because these mails were sent to a server in California. The complaint seeks damages because they were sent by the defendants from California and damages because they were sent to the plaintiff in Maryland. Therefore, even if they had all gone directly to Maryland, which some of them did… From the plaintiff's brother in California. No, Your Honor. From the defendant's place of business. I thought it went to the computer that he bought for $1 and transported from California to Maryland in order to have it received in Maryland. Your Honor, that was done before the time of the emails at issue in this case. Nothing on that $1 computer is an email that's at issue in this case. There's another red herring. Dealing with this alternative theory, I just want to close that before we go anywhere else with it. You bring up this business of consent. As I understand it, you put email codes into your website and that's the way spammers sort of operate. They tack on these codes and they don't actually go to the email address and they send spam there. So, I don't know if you call it a bait. It's a little bit more than a bait because it's a net that you put out there. Because those emails embedded, codes embedded in a website, all they do is catch spammers. So, that's what you are consenting to do. You are actively out there for one purpose. This is tort law now. We're not talking all the other stuff. One purpose, and that is I'm trying to get hurt in order to be able to sue. Yes, Your Honor, if I may respond. Because you put mousetraps in a barn doesn't mean you're inviting the mice to come into your barn. The use of spam traps. If you're trying to catch the mice. Yes, Your Honor. And here you're trying to catch the spam, which are prohibited. Yes, Your Honor. That's what our clients were trying to do. Unlawful spam that was being transmitted so they could bring a cause of action as the state legislatures deputized them to do as private attorneys general. The use of spam traps, as Your Honor described, is a well-established law enforcement technique. As we mentioned in our brief, the Attorney General of New York, Microsoft, have used spam traps in pursuing unlawful spammers. We do not think that constitutes a bar to suit far from it. The Attorney General of New York does this. Yes, Your Honor, we cited that in our brief. Are you coming in that vein that you are – what is that doctrine that allows you to act as the Attorney General when the Attorney General won't do his job?  Your Honor, it's these statutes that say the statute may be enforced by the Attorney General, but it may also be enforced by private attorneys general, such as our plaintiff, who receive unlawful spam. And so if the use of a spam trap is an improper technique, then there's no reason to think that couldn't be applied to the Attorney General as well. It's one thing, though, for a private person to enforce a spam act and get damages because he's received spam, and another for a person to seek out to receive a spam and then sue for it. Your Honor, that's exactly what our client did. Our client sought to receive unlawful spam. And that troubled the district judge. I understand it did trouble the district judge, but it's not a legal bar to recovery in this case. And you haven't explained why. That was the question Judge Wynn asked quite a bit ago. Why isn't that doctrine applicable in California and Maryland? If I could try to clarify my argument. We have a legal basis for it and a factual basis. The legal basis is that the issue of consent is not controlled by the common law of California or Maryland with regard to these statutes because the statutes themselves deal with consent. The California statute defines consent as being express consent, and that didn't occur in this case. So you don't think by putting those e-mails in there for the only purpose of catching these e-mails, these spam, which is what they do, that's all they do, you don't think that's consent? No, Your Honor. It's certainly not express consent. It's because, among other things. Maybe not because of what it is. It's not easy to understand, but that's exactly what it's doing. I mean, if you express it standing out there and said, give me all of your spam. No, Your Honor. You know exactly where it's going. It's going to those e-mails with those codes. I'm sorry, Your Honor. No, Your Honor. The page on which the e-mail addresses was posted said, these e-mail addresses do not consent to the receipt of commercial e-mails. Now. Okay. The defendant didn't pay any attention to that. Their web crawlers harvested the addresses and they sent it anyway. They have codes. Is it written in code that these e-mails do not receive it or is it? The web page. The e-mails have codes. And I understand you've got written stuff up there that says something, but you can have the actual e-mail address. It's not going to pay that any attention either. Your Honor, the page. But if you put it in a code, do not send your stuff here because if we are going to prosecute you for spamming, that's a different thing, but it's a code. Right? Your Honor, the page said the following e-mail addresses do not consent to the receipt of commercial e-mails. The defendants ignored that, or their web crawlers ignored it, and they sent it anyway. That we would contend means there was not consent under California law. But maybe I don't understand it. But as I understand it, no spammer reads that. What they're looking for is codes. It is the code that you put out there to put this net to grab it. That's correct, Your Honor. And you put it out there in order to attract the spam. Yes, Your Honor. Well, why isn't that a voluntary objection to injury? Your Honor, the same thing could be. Is that in common law doctrine? Yes, Your Honor. The same thing could have been said about the plaintiffs in the Supreme Court's decision in the Havens case. Testers under the Fair Housing Act who voluntarily went out and sought opportunities to detect discrimination under that law so they could bring suit. And the Supreme Court said that was okay for them to have standing to do that. That's a standing issue, isn't it? Well, yes, Your Honor. But it's also the doctrine of non-fit, the doctrine of. . . Did the court address the common law doctrine? No, sir, Your Honor. But if the same common law doctrine had been applied in that case the way the district court did here, it would have barred the plaintiffs from recovery. The same thing could be said. . . That may not have been a tort even. I mean, the case isn't just a totally different ballpark. I mean, it's addressing a totally different issue. The question is, is a person who's doing the testing have standing for Article III by doing the testing? And it seems to me in this case the court is saying you are claiming tort injury and you have voluntarily placed yourself in harm's way for such a tort and therefore shouldn't be able to claim the damages for that tort. I understand, Your Honor, what the court said. What the court said undermines the purpose of the statute, which was to provide a remedy for people who receive unlawful spam and to incentivize private attorneys general seeking to recover the statutory damages to bring actions against what was viewed as an overwhelming tidal wave of unlawful spam. This is strong medicine, but the statutes provided the strong medicine because it was a very serious problem and they felt that the attorney general by himself wouldn't be adequate to cope with it. And therefore it sought to create an incentive for private parties, such as our client, to undergo the considerable time and expense of finding and detecting unlawful spammers. Does the statute authorize your client to sue on behalf of other people who receive spam? It authorizes them to sue on behalf of anyone who receives spam through their Internet service. Well, that's a little bit. Yes, Your Honor, it only authorizes it to sue on behalf – sue as – obtain a remedy for spam that was actually transmitted to it. But it – but they have standing suit for anything that comes through their system regardless of where it may ultimately be sent. Okay. I see you have some rebuttal left. Yes, Your Honor. Why don't we hear from Mr. Graham? May it please the Court? My name is Daryl Graham. I'm here on behalf of Kraft and K.H. Engwell. Your – a couple of points addressing the discussion that just took place. Number one is this goes beyond just collecting spam and inviting spam. But they – this was their business model. This is all that they wanted. This is how they operated. This is how they survived. So, to Judge Wynn's point, these people, BSI, went beyond just enticing people to send spam to them. But they wrapped their whole business model around it. Now, to Judge Stacker's point, the emails that they're suing on, the way they get to the hundred and some million dollars is by double-dipping. They send the one brother – and this was all intentional. This was part of their business plan. This was part of the model. This is part of what they sold to attorneys trying to induce attorneys to represent them. The one brother received the email in California, routed the email to Maryland, and both brothers sued. And this is what happened with Kraft initially. The reason we're here and we often talk about that alternative theory, so to speak, the basis, is because in the Fourth Circuit we have this Omega case. Yes, sir. The Omega case basically says that if this survives the preemption because it's a vein in court. And I'm not sure, is the Omega case the case in terms of being a vein in court? Is that pretty much the interpretation in all the other circuits? Well, certainly the Gordon case interpreted it that way, which is the Ninth Circuit, and Omega interpreted it that way in the Fourth Circuit. And when you look at what is happening in these cases and in the injury that's trying to be remedied, the only exception to preemption under the federal law is false and deceitful email. And that rings of fraud and it rings of a tort. So our position has been, and we believe it's consistent certainly with the Ninth Circuit and with the Fourth Circuit, that tort defines the scope of the claim here. And as a tort, you have to show damages and you can't invite the harm onto yourself, which is exactly what these people did, which is what BSI and HyperTouch both did. So is it like an assumption of the risk, sort of? Well, I look at it more closely as, you could look at it as an assumption of the risk, but it's also consent. When I'm inviting someone to send me email, and when my business model… I'm not sure that might not be a hurtful concession on your part. Assumption of the risk is a defense, and you assume the possibility that a tort may occur. It's not as directly applicable for purposes that Valentia non fituria are. That doctrine basically is, if you subject yourself voluntarily to injury, you can't sue for the injury. And it's actually interpreted directly as, two persons voluntarily, you are not made injured under the tort law, because you voluntarily submitted yourself to that injury. And so that's a little bit of a stronger doctrine than it is part of the bypass. Your Honor, I absolutely agree with what you've explained, and that was our position in our brief. However, to Judge Wynn's point, what you have here is, he talked about mousetraps. It's like the situation where if my job is to collect garbage, and I collect garbage, I can't claim that I've somehow been injured by collecting the garbage. That's my job. If my job is to maintain a building and people litter at my building, and I have to pick up that litter, then I'm injured. Here, their business plan, their business model was to collect, as they claim, garbage, the spam. That was their model. So when they're collecting that garbage, that spam, they shouldn't be able to come back under the doctrine of consent. They can't come back and say, you know what, I never really wanted that spam. I didn't want to be affected by it. As I understand it, maybe the illusion made that they were acting sort of as a private attorney general here. The statute allowed that, either the attorney general or private individuals who are like attorney generals can do this. Okay. We don't believe that they're in a – number one, factually, we don't believe that they're a private attorney general. But number two, we don't believe that the statute encourages opportunistic plaintiffs like this to bring suits for this type of activity. And what I mean by that is that the statute, for instance, what Judge Massetti did is he gave the instruction that you – is this – he asked the question, is this a bona fide ISP? Is it a legitimate ISP? And the way he defined it was, is it in the business principally and primarily as an ISP, or is there some other purpose for it? And where was his support for that jury instruction? The support – I'm sorry. Where in the statute or anywhere does it say that the ISP has to be bona fide? The problem with all these statutes is the definition of an ISP is not well-defined. That's true under the Canned Spam Act. ISP is not well-defined. And in the Gordon case, the Ninth Circuit decision, what the court had to wrestle with is, okay, what is an ISP? Is everyone an ISP? I mean, I have my cell phone there, but at trial, they were asked the question. Their expert was asked the question and the principals were asked the question. If you have a cell phone and someone uses your cell phone to transmit email, is the person with the cell phone an ISP? And their answer was yes. But the judge in this case, in instructing the jury on a bona fide service provider, said that service provider has to be primarily and substantially a service provider. Yes, sir. And, well, the question is what happens if you have a firm that's primarily and substantially a consulting firm but has 40 percent service as a service provider? I mean, he just eliminated the statute, it seems to me. He had no basis to say a bona fide service provider is one who's primarily and substantially. It seems to me they're either doing that business or they're not. There's nothing that requires them to be 100 percent. I certainly think you could reform the jury instruction to me to be more competent. If the jury answers bona fide, they say they're not bona fide, that means they're not primarily doing this. But they could be subsidiarily doing it. In other words, 60 percent consulting and 40 percent ISP. It seems to me that person still has the right under the statute. I think the difference there is if my job is to consult and my job is to be an ISP, my job is not to be a professional litigator, which is what we have in this case. No, but that doesn't address the statute. We're talking about the instruction the court gave on this bona fide service provider. And the judge says if you're not primarily an ISP, you can't be a service provider. The statute doesn't say that. And my hypothetical is to you, if a company does 40 percent of its business as an ISP and 60 percent as a consultant, the jury would have said he's not a bona fide service provider. But the statute doesn't say that. Well, I think in the context that Your Honor described, if a company does 40 percent as an ISP and they're doing legitimate, everyday ISP-type work, that they are still acting as an ISP. Okay. But see, the court instructed the jury that that person would not be an ISP because the court said were they primarily and substantially. And it seems to me that it eliminates the person who is 40 percent, and the statute doesn't allow that. I don't think that holding by the jury based on that instruction advances your case a bit. I don't even think it's relevant in this case anymore because of that. That's just my conclusion from this little dialogue we're having here. Maybe I'm wrong on that, and you can tell me I am, but I'm not sure you can collect a lot of pennies from that one. Okay. Well, what the court did is what the Ninth Circuit did essentially in the Gordon case on that point. And it had to determine what was an ISP that has a right to sue. What are the characteristics of an ISP that has a right to sue? And what the court wrestled with was it can't be every entity that has a cell phone or every individual that has a cell phone. That may be a problem with the statute, but the court basically rewrote the statute and says you can be an ISP only if you're primarily and substantially an ISP. And Congress didn't say that. You can be 40 percent an ISP just as you conceded a second ago and be an ISP, right, and have the benefits of the statute. I think if you're... 25 percent, 20 percent. Well, I think at some point it depends on what the purpose of your business model is. If I'm a consultant and want... My business model is 20 percent ISP, legitimate ISP service, and 80 percent consulting. I get the benefit of the statute, don't I? To the extent that you're handling... To the extent that you're operating... To the extent that you're handling email and transmitting email and operating a legitimate business... Yes. I would say you get the benefit of the statute. Okay, and the court in this case defined me out of the statute. Well, but the court was dealing with the facts of that, of our particular case. It didn't define, when it gave the jury the question, were these plaintiffs bona fide service providers, that may have been okay. But then when it defined it, it basically eliminated anybody who wasn't primarily an ISP. I don't think it eliminated anyone that wasn't primarily an ISP. Primarily and substantially. I think he had to be substantially an ISP. And here, what the jury found is that... Well, where's the factual evidence? Well, none of the statutes say that with respect to the ISPs. You know, we're just repeating, but you can go ahead. Okay. With respect to the consent argument, Your Honor... Is it consent or voluntary? Well, it... In other words, the actual phrase, and I haven't pursued this, but the phrase is if you voluntarily subject yourself to injury, you're not injured. For the purposes of court law. And it's not an idea of consenting, saying, I consent, hit me. It's basically you voluntarily expose yourself, knowing that you're going to be hurt. It's actually, it's both of those, because in part, part of the issue here is, on the consent point, part of the issue is the transmission from one brother to the other brother in the form of an agreement. They had an agreement to submit these emails. And so, you know, they want to say that their private attorneys are out there, they're trying to do good work and prevent spam, but they're actually multiplying the spam. The one brother receives it, he sends it to the other brother, the other brother... That doesn't address the question of whether they are voluntarily receiving spam. Well, the second brother certainly voluntarily received it. Both of them are. They're seeking it. Both of them are seeking it. Yes, both of them are seeking it. What I would say is the first brother is voluntarily receiving spam because his service collected. The second brother is consenting and voluntarily receiving spam because he has an agreement with the first brother to take the spam. So I think it involves both those concepts. And that's, in part, what's troubling about what BSI has done here, which is they've created the system where, as they admitted it, whereas what they admitted in court and what Judge Mazzetti recognized is you could have servers, they could set up servers in 35 different states. Okay. I think the red light's on. Thank you, Your Honor. Mr. Rothman, I guess you have some time. Good morning. May it please the Court. My name is Ari Rothman, and I represent Defendant Connexus Corp. And the issue for Connexus Corp. in this case is the district judge's granting of summary judgment.  And what we showed there and what we've heard here today, I think, is a pretty clear admission that the HyperTouch and Beyond Systems brothers undertook actions to intentionally receive the spam and send it from one server in California to Maryland. So on the undisputed facts, and this is a little bit of a unique circumstance because the trial judge here actually heard live witnesses and trial testimony, but this is still a Rule 56 motion, those facts are undisputed. So the only question then is, is does the consent doctrine apply under Maryland law and California law? And we say pretty clearly that it does. Under Maryland law, there's a case called Mary CLE, which is cited in our brief. It's 898 Atlantic 2nd, 818. And what the Court found there construing this statute is, quote, MCMA violations, like violations of the Consumer Protection Act, are in the nature of a tort. And as a result, the same principles that guide us when faced with questions of individual liability for torts apply here. Clear statement, the consent doctrine applies to MCMA. Not responded to by appellants in their brief, uncontested. What Maryland says about consent is, is those who with full knowledge assent to the invasion of their interest may not complain. That's the Janelson's case. California took it a step further and they codified the consent doctrine, 3515. And what that says is, this is the civil code. 3515 is a codification of the maxim Valenti non fit injuria, which is a basic tenet of California jurisprudence. It precludes the maintenance of an action for wrong by one who has consented to the act which has occasioned his loss. Now what we heard a few minutes ago was the business and professions code has a direct consent language in it. And it does. It's under 17529.51, I think. And what that says is, is that goes to the issue of consent for the purposes of statutory damages. Because under 17529.5, you can only seek the liquidated damages if the email is unsolicited. It says absolutely nothing about the overall California 3515 civil code section that would be a complete bar to the action. The direct consent piece under 17529 just goes to statutory damages. In terms of, I believe this is also in our brief, whether or not either of the statutes empowered the private attorney general or empowered them as private attorney generals. I think the answer to that is pretty clearly no. 17529.5 sets forth three categories of people that can bring actions. Individuals, recipients, they don't claim that. Internet service providers, they claim they are one of those. And the attorney general. But the jury found they were an internet service provider. The internet found that, excuse me, the jury found that they met the technical definition of an ISP. That is a true statement. But the next question is, did they, notwithstanding that, still consent, you go back to tort law. Did they still consent to the injury over which they're complaining? And the consent here would be doing things to receive the emails. And they don't contest that. And that was a pretty clear finding below. So even if they did meet the technical definitions, they still are barred, the consent doctrine still bars their claim. Now, in terms of what the jury found, the instruction issue, we don't think it matters for the purpose of consent. Because we were on a summary judgment motion, and the jury's findings was what it was, and the instruction was what it was. I think the district court concluded because they were not a bona fide service provider, they therefore did not have the benefits of statute. And based that on the jury finding. And my only suggestion to your colleague was that maybe that's so if the jury made that finding. But the court then defined a bona fide service provider to be one primarily substantially engaged in that business. And to me, that just modifies the statute. I think the issue, well, first, we had an advisory jury here. It wasn't a jury whose findings were binding on the district court in that sense. So what Judge Macedi did is. I understand, and I agree that it probably doesn't affect the argument on the consent issue. But I'm just suggesting that you have a hard row to hoe in trying to argue that this was not an Internet service provider that has the benefit of statute. I think, well, what my client is saying is independent of that, I think. What my client is saying is, is because Beyond Systems and HyperTouch did things to intentionally receive these emails and send from one brother to the other, it doesn't matter whether they're a legitimate ISP or not. That's what they did, and the tort law, the consent doctrine, bars them from suing and from recovering under those circumstances. I understand that, but I thought the district court also made an argument they couldn't even have the benefit of statute because they weren't on an ISP. That is another finding that the district court made. I'm just suggesting that's a hard argument for you to make if not that you're subscribed. I mean, I don't disagree that this is an entity that falls outside. Here's what I guess what we're saying. If you have an entity like this one on the specific facts of this case that is doing things to trigger the statute intentionally, then it is not within the class of entities that these statutes are intended to protect. Senator Tittlebaum, in enacting the statute, talked about how it gave victims the right. Well, they're not a victim if they're going out and soliciting it. 17-529, the preamble talks about – But the language is very difficult to make that argument. I mean, you have to read the statute. We start with the text. And to get to the point that you're arguing, it doesn't make those distinctions. And it doesn't make the distinctions whether you're primarily in the business or secondarily in the business. It seems to me if you're in the business of that and the jury is so bound, then your good faith and all this other stuff will have to rely on court law as opposed to statutory provision. Maybe, but certainly you can rely on the tort law as an independent basis. But it is also, we think, acceptable. The statute is ambiguous. And they don't contest that the statute is ambiguous. That's an argument that we made. And if it's ambiguous, you can go to legislative history. And the preamble to 17-529 is statutory. It's right there in the statute. And you compare what those ills were identified as compared to what beyond systems experienced, and they don't add up. And if they don't match up, they're not within the class of entities that the legislature is intended to protect. Thank you. Thank you, Mr. Rothman. Mr. Willard, do you have some rebuttal? May it please the Court. Consenting to receive spam is not the same thing as consenting to receive false or deceptive spam. In fact, the Maryland statute is not limited to unconsensual spam. The Maryland statute provides that someone who receives spam that's false or deceptive has a cause of action for statutory damages, even if they signed up and asked to get spam, because they didn't ask to receive false or deceptive spam. So that's an important distinction here in this case. Except your case is dependent on the false, on the tort aspect, because otherwise it would be preemptible. Yes, Your Honor. So we can limit ourselves in this case to a class of spam that are fraudulent or false or deceptive. Your Honor, certainly on appeal we have to assume the emails that we're suing on are false or deceptive, both to avoid preemption as well as to satisfy the requirements of the statute. My point is that we didn't ask to be sent false or deceptive spam. You asked to receive all spam, including false and deceptive. And you're bringing suit only with respect to the false and deceptive ones you receive. But you consented to all of them. Yes, sir. And the Maryland statute says even if you consent to receive all kinds of spam, you still have a cause of action if people send you false or deceptive spam. The statutes don't make it unlawful to send people spam. They make it unlawful to send people spam if they're false or deceptive. I understand. But if you – if we're applying the principles of court law, then you ask that it be sent to you or seek it out and therefore suffer the injury. The court law would say you can't make a claim to that. Not so, Your Honor. If I invite someone into my house and they steal the silver, I didn't consent them to steal the silver just because I invited them into my house. Judge Massetti's opinion had what I thought was a very telling analogy. He said if you put up a no-press passing sign and you leave the windows open and the silverware on the table, you can't complain when someone comes in and steals it. Well, yes, you can. You can sue them for conversion if they come under those circumstances. It's not a defense to someone violating the law that you consented for them to do something that doesn't violate the law. Well, I know the person who invited you in the house didn't invite you to come in to steal. That's correct. But you did invite the spam that was subject to the Maryland law, which is the deceptive spam. Your Honor, the consent was to spam. It didn't consent to false or deceptive spam. And Maryland law provides if you consent to receiving spam, you still have a cause of action if it's false or deceptive. Now, if I could just briefly address the factual underpinnings of the judge's consent argument. We've talked a good bit today about the spam traps. Only some of the emails at issue in this case were sent to spam trap addresses. The judge also found that some of the emails were sent in response to an opt-out request. And we should have known that opting out, no means yes. And therefore, we consented to receiving those emails, even though it's a violation of federal law for spammers to send spam email after getting an opt-out request. We consider that to be a complete distortion or an Alice in Wonderland treatment of the opting out requests. And again, only some of those were sent in response to the opt-out requests. And then finally, the judge found that we consented to receive spam because the spam was arranged to be routed through HyperTouch's email servers in California. And I still don't understand how that meant that we consented for the defendants to send spam, regardless of where it was routed. These arguments sort of have something troubling about them, and I can't lay my finger on it. You get up and say, our business is to police the internet, seek this stuff out. And now you're saying we really didn't seek it out. Thank you, Your Honor. And you were seeking out spam that violated both federal and state law. And now you say, well, we were seeking this class, and we weren't seeking this class, and we're suing under this law and that law. Your whole idea is to put yourself in the root of spam in order to sue for it. Yes, Your Honor. Wherever you could sue. Yes, Your Honor. And that could be said of the testers in the Havens case who were seeking out violations of the Fair Housing Act. It could be said of handicapped rights advocates who seek out violations of the laws on disability access so they can bring lawsuits under those. I don't see the analogy that you're trying to make there, but here we're talking about the doctrine of common law court and voluntarily getting in the way. And in the testers' cases, the question was they were injured for the purpose of bringing suit there. And I – there may be some arguments you could make, but I think you're going to have to cross some bridges on those. I understand Your Honor's position is very clear. Our position is these are statutory causes of action, and common law doctrines like non-valenti non-fidelity. What about the case that your colleague across the table there cited, the Maryland case that said a claim under the state spam statute was a tort? I'm not denying that it's in the nature of a tort, Your Honor. What I'm saying is that this – The court went on to say that the principles of the court apply. All the principles of the court apply. Well, Your Honor, all the principles of the court actually don't apply. This is what the – I said that. I'm just – Yes, Your Honor. You're going to say the court was wrong again. I think the court language may have been a bit broad and went beyond the issue it was considering. In the hyper touch versus value click case in the California Court of Appeal, which we cite in our brief – I'm talking about Maryland. I understand, Your Honor. Under Maryland law, there was not a holding that all of the elements of the court apply, such as reliance, detrimental reliance, any of the other things that are required to prove common law fraud. This is a statute that is not common law fraud. It's a statute that punishes very specific conduct, sending false or deceptive emails. You don't have to prove all the elements of common law fraud in order to recover under this statute. They said it was tort, and not all torts require reliance. There's the tort of negligence, and there's torts of assault, and there's all kinds of torts. But there are principles of torts that apply across the board. Your Honor, principles of tort – Environmental injury and damage. No, Your Honor. In the Omega decision, this court didn't apply the principles of a tort across the board. What it said, we look at tort principles to decide what the canned spam app preempts as being false or deceptive. It didn't say we import all principles of tort law to a statutory cause of action. The question is whether the statute's purposes would be undermined by applying a common law doctrine to the statute. And here we contend that it would. Thank you. We'll come down and greet counsel and then proceed on to the last case.
judges: Paul V. Niemeyer, James A. Wynn, Jr., Stephanie D. Thacker